IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| DYLAN J. SPARKMAN, | CV 24–06–H–DWM |
| Plaintiff, | |
| vs. | ORDER |
| BRADLEY BRAGG, TROY CHRISTENSEN, and DANIEL BRUNO, | |
| Defendant. | |

Plaintiff Dylan J. Sparkman, a state pretrial detainee proceeding pro se, alleges that he was denied adequate medical care following an assault by another inmate at the Lewis and Clark County Detention Facility in violation of his constitutional rights. (*See* Doc. 2.) He names as defendants Captain Bradley Bragg, Lieutenant Troy Christensen, and Sergeant Daniel Bruno (collectively, "Defendants"). (*Id.*) Pending before the Court are two motions filed by Sparkman seeking to supplement and/or amend his complaint, (Docs. 17, 28), Sparkman's motion to compel discovery, (Doc. 27), and Defendants' motion for summary judgment, (Doc. 19). For the reasons provided below, Sparkman's motions are denied and summary judgment is granted in favor of Defendants.

1

## BACKGROUND

The following facts are undisputed unless otherwise noted, (*see* Docs. 2,[1] 21,

25), and viewed in the light most favorable to Sparkman, *Tolan v. Cotton*, 572 U.S.

650, 657 (2014) (per curiam).  Of particular note, the record contains four video

recordings: body camera footage from two detention officers, (*see* Docs. 20-1, 20-

11), and surveillance footage from two overhead cameras, (*see* Docs. 20-2, 20-3).

## I.    The Assault

On October 1, 2023, Sparkman was booked in the Lewis and Clark County

Detention Center as a pretrial detainee.  (Doc. 21 at ¶ 1; Doc. 20-5.)  On November

17, 2023, while Sparkman was housed in Pod 7, he and another inmate, Gregory

Cole, got into an argument that resulted in Cole striking Sparkman twice in the

face with an open hand, first at 6:57 p.m. and again at 7:02 p.m.  (Docs. 20-2, 20-

6.)  Around 7:05 p.m., Detention Office Meaghan Dawson entered Pod 7 for a

security check.  (*Id.*)  According to Dawson, Cole immediately began to yell that

he needed to talk to Bruno and that Sparkman needed to be moved.  (Doc. 20-6.)

Bruno came and Sparkman was taken to the library.  (*See* Docs. 20-2, 20-3.)  At

---

[1] Because Sparkman's complaint is sworn, (*see* Doc. 2 at 40), it is considered a
verified complaint and therefore may be relied on in opposing summary judgment
to the extent it is based on personal knowledge and sets forth specific facts
admissible in evidence.  *See Schroeder v. McDonald*, 55 F.3d 454, 460 nn.10–11
(9th Cir. 1995); *McElyea v. Babbitt*, 833 F.2d 196, 197–98 (9th Cir. 1987) (per
curiam).

that time, the detention officers reviewed camera footage from the pod, which revealed that Cole had struck Sparkman. (Doc. 20-6.)

Bruno and Dawson went to the library to speak to Sparkman. As Bruno entered the library, he told Sparkman that Sparkman needed to decide how he wanted to proceed, stating "[h]e hit you twice, you can press charges if you want. That is your right." (Doc. 20-1 at 0:50.) Sparkman begged off answering, stating that he was "really dizzy."[2] (*Id.* at 1:45.) While Bruno did not demand an answer, he said that nothing could proceed until Sparkman made a decision and that it was "100 percent [Sparkman's] choice." (*Id.* at 2:03.) Sparkman asked to speak to Bruno without Dawson present and, after they sat down, told Bruno that he was "really anxious." (*Id.* at 2:46.) In response, Bruno said, "I bet there's an adrenaline dump," and confirmed with Sparkman that Cole had slapped, not punched, Sparkman. (*Id.* at 2:48, 2:57.) Sparkman then asked Bruno about Cole's reaction and asked Bruno for his advice on how to proceed. (*Id.* at 3:05, 4:01.) Bruno reiterated that he could not tell Sparkman how to proceed because he could not come across like he was protecting or favoring one inmate over another. (*Id.* at 4:01.) Sparkman told Bruno that he felt as though he was going to pass out. (*Id.* at 3:48.) During this exchange, Sparkman's focus was on his housing situation and

_____

[2] Notably, Sparkman had a prior medical visit on November 3, 2023, wherein he reported that he has "blackouts" and that "when he stands up he gets dizzy and everything goes black and he has to sit down." (Doc. 20-8 at 15.)

whether or not he would be moved because of the assault. (*See id.* at 4:56.) While Bruno told Sparkman that he could not continue to be housed with Cole if he pressed charges, Sparkman specifically asked if there was a possibility he and Cole could talk it out and he could return to the Pod. (*Id.* at 5:48.) After that, Sparkman once again asked about Cole's reaction and Bruno told Sparkman that he had already informed Cole that Bruno did not believe that Sparkman wanted to press charges. (*Id.* at 8:30.) As Bruno left to talk to Cole, Sparkman asked him for some Tylenol because he "gets anxious." (*Id.* at 8:40.)

Once left alone in the library, Sparkman paced for approximately twenty minutes. (*See* Doc. 20-3.) At that point, Dawson brought a trashcan at Sparkman's request because he told a detention officer over the intercom that he was nauseous. (*See id.* at 24:41; Doc. 20-11 at 13:50.) Sparkman alleges that he also requested medical care over the intercom. (*See* Doc. 25 at ¶ 8.) When she brought the trashcan, Dawson briefly sat at the library table with Sparkman. (Doc. 20-3 at 24:41.) Dawson asked Sparkman if he had "decided anything" and why he felt like he was "going to throw up?" (Doc. 20-11 at 13:57.) In response, Sparkman said, "I don't know. Maybe just the stress of it all. I don't know. I'm nauseated." (*Id.* at 14:13.) Sparkman once again asked about Cole's reaction and Dawson simply said they were talking to him. (*Id.* at 14:25.) As Dawson left the library, she confirmed that Sparkman was good to be left alone, and she

admonished him not to remove some plastic gloves that had been discarded in the trashcan she gave him. (*Id.* at 14:55.)

After Dawson left the library, Sparkman continued to pace for over an hour, sitting down and either spitting or dry heaving into the trashcan twice. (*See* Doc. 20-3.) After the detention officers interviewed Cole, a mediated conversation was held between Cole and Sparkman in the library. (*See id.* at 1:51:30 to 2:12:43.) Afterward, Sparkman and Cole were both returned to Pod 7. (*See* Doc. 20-2 at 1:33:00.) Both men then ate some food while occasionally speaking to each other and watching television. (*See id.* at 1:37:00.)

## II. Medical Care

It is undisputed that on November 10 and December 2, 2023, Sparkman filed medical requests complaining of hip and sciatic pain, which he attributed to an injury that occurred three years prior. (*See* Doc. 20-7 at 25, 29.) Nursing staff responded with the suggestion that Sparkman avoid heavy lifting, use icepacks, and do some stretching to relieve his pain. (*Id.*) Sparkman also requested to meet with a mental health case worker on December 5, 2023, but declined to meet with them when scheduled on December 13, 2023. (Doc. 20-7 at 23.) On December 11, 2023, Sparkman requested to be seen by medical providers for his back pain and mental health medication. (*See id.* at 19.) While that request did not reference the November assault, Sparkman indicated that he made previous requests for

some type of care insofar as he stated that he "put in 2 pureview packets over the last 2 weeks." (*Id.*)  In response, that same day, a facility nurse informed Sparkman via the digital grievance system that he was "on the list to be seen by a provider at Pureview" and that "[t]here is a wait time of several weeks" as "[l]ots of people are in line." (*Id.* at 19.)

On December 14, 2023, at 12:02 p.m., Sparkman filed an "Emergency Grievance Appeal to Sergeant," claiming that the assault had not been handled properly and that he needed to be seen by medical for injuries associated with the assault. (*Id.* at 12.)  Lieutenant Troy Christensen denied Sparkman's grievance as untimely because it was not filed within 48 hours of the incident. (*Id.* at 13.)  At 12:30 p.m. that same day, Sparkman filed a medical request stating that "on 11/18[,] I put in a pureview packet because I was worried about having a broken cheekbone, concussion, ruptured eardrum, and chipped tooth.  Why haven[']t I been seen yet?" (*Id.* at 10.)

On December 19, 2023, Sparkman filed an appeal of his grievance to Captain Bragg, alleging that the November 17 incident had been mishandled and that he needed to be seen by medical. (*Id.* at 1.)  On December 21, 2023, Bragg responded to the grievance, stating that it was not timely but that he nonetheless reviewed the video footage and found no violation of policy or procedure and that the matter was administratively closed. (*Id.* at 2.)  With regard to Sparkman's

medical care, Captain Bragg advised Sparkman that he had not made anyone aware he wanted to be seen until he filed his grievance but that he would now be scheduled to meet with medical staff. (*Id.*)

On December 21, 2023, Nurse Taylor Schraudner responded to Sparkman's medical request via the digital grievance system, asking "[w]hen did these injuries occur? You have not mentioned any of this at med pass and I have seen you regularly for the last week. We can put you on the clinic list but please provide me with information on how and when you were hurt . . . you have been with us for some time now." (*Id.* at 11.) Later that day, Sparkman was seen by Nurse Schraudner to address his alleged broken cheekbone. (Doc. 21 at ¶ 27.) Although the appointment notes indicate that Sparkman acknowledged he had not previously sought care for any injuries associated with the November assault, (*see* Doc. 20-8 at 13), Sparkman disagrees with that assertion, (Doc. 25 at ¶ 28). Nurse Schraudner agreed to schedule an appointment with both Dr. Courtnay Crowell, Sparkman's former provider at PureView Health Center, and a dentist. (Doc. 20-8 at 13.)

Dr. Crowell saw Sparkman on February 13, 2024. (*See id.* at 30–32.) Dr. Crowell summarized Sparkman's report as follows:

> [Issue] #2 left-sided headaches. He was in an altercation in November 2023 in which his head was hit severely. He had nausea and vomiting afterwards. He did have some bleeding from his left ear he reports. Since then he gets headaches on the left side of his head when he is

exercising.  He also notes 2 chipped teeth on the left side of his mouth and pain along his left zygoma.  He has in the past had surgical reconstruction of his zygoma for trauma.  He is wondering if he needs cranial imaging or medication for his headaches.

(*Id.* at 30.)  Dr. Crowell ultimately noted "no red flags indicating [Sparkman] needs a CT scan to look for broken bones or for [a] subdural hematoma" and that they "would do best to address his headaches after he is stable in Zoloft/sertraline." (*Id.* at 31.)  Dr. Crowell did not diagnose Sparkman with any broken bones or a concussion and noted that Sparkman's complaints of a bleeding ear were self-reported.  (*Id.* at 30–31.)  Sparkman was seen by a dentist at PureView on April 3, 2024, and reported pain in a molar that Sparkman believed had resulted from a filling falling out when he was struck by Cole.  (*Id.* at 36–37.)  He was referred for a root canal.  (*Id.* at 36, 38–39.)

While Sparkman does not dispute much of the above, he emphasizes that on November 18 or 19, 2023, he requested medical care by submitting a "PureView packet" to staff, and that this request was recorded on November 26, 2023.  (Doc. 2 at 17–18, 29; Doc. 25 at ¶¶ 16, 21, 25; *see* Doc. 25-1 at 17.)  In addition to the PureView request, Sparkman maintains that he requested medical care when he asked for the trashcan to vomit in the day of the assault, and when he told a detention officer about blood he found on his pillow on November 18, 2023.  (Doc. 25 at ¶ 17.)  He also inconsistently alleges that he specifically asked Bruno for care right after the assault.  (*Compare* Doc. 2 at 12, 28 *with id.* at 14–15.)  Sparkman

sums up his medical grievances as follows:

> Sparkman grieve[d] his lack of medical care for on-going medical symptoms, which resulted when Sparkman was the victim of an assault while in the custody of LCCDC. Sparkman requested medical care after the assault, and the following day as well. Sparkman informed medical of his symptoms and was provided with a Pureview packed which was logged on 11-26-2023. Sparkman then waited two weeks to be seen by medical or be taken to Pureview. Sparkman's medical symptoms worsened over the two weeks, and on 12-11-2023, Sparkman filed a new medical kite explaining that his symptoms are getting worse and that he's already put in 2 Pureview packets. In response, an LCCDC nurse explained that it is a very long list to be seen at Pureview. Therefore, on 12-12-2023, within 24 hours of being told by kite that his medical treatment will be delayed, Sparkman filed a grievance in compliance with the LCCDC Grievance Procedures.

(Doc. 25 at ¶ 42.) He further states that after he was moved to Pod 2, away from

Cole, he made daily requests for Tylenol and Ibuprofen. (*Id.* at ¶ 17.)

## III.    Procedural Background

On January 11, 2024, Sparkman file suit, alleging that Defendants Bruno,

Christensen, and Bragg violated his due process rights by failing to provide him

with or delaying adequate medical care. (Doc. 2.) On March 27, 2024, Defendants

were ordered to answer, (Doc. 7), which they did on May 27, 2024, (Doc. 10). A

scheduling order was issued on May 30, 2024. (Doc. 12.)

On September 3, 2024, Sparkman filed a "motion for supplemental

complaint," indicating his desire to amend his complaint to include further

information about the medical care he received after his January 2024 Complaint

was filed. (Doc. 17.) Although not filed until January 2025 due to a clerk error, on

November 8, 2024, Sparkman submitted a second motion to amend his complaint,

(Doc. 28), and, on November 13, 2024, a motion to compel discovery, (Doc. 27).

On November 29, 2024, Defendants filed a motion for summary judgment. (Doc.

19.)  Accordingly, there are four pending motions in the case.

ANALYSIS

## I.    Amendment

Sparkman seeks to amend his complaint on two grounds.  First, he requests

that he be permitted to supplement his complaint to include information regarding

the medical care he received after January 2024.  (Doc. 17.)  While that

information may go to the proof and potential damages for his existing claims, it

does not alter his fundamental claim.  Sparkman's first request to amend is denied.

Second, Sparkman asks that he be permitted to amend to add Officer

Meaghan Dawson as a defendant.  (Doc. 28.)  Because a scheduling order has been

entered in the case and the amended pleading deadline has passed, (*see* Doc. 12 at

6 (setting deadline for August 30, 2024)), good cause must be shown.  Fed. R. Civ.

P. 16(b)(4).  Good cause to change deadlines may be found if deadlines "cannot

reasonably be met despite the diligence of the party seeking the extension."

*Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992).

Consistently, "the focus of the inquiry is upon the moving party's reasons for

seeking modification."  *Id.*  Here, Sparkman alleges he was not aware of Dawson's

alleged misconduct until he viewed discovery in the case, specifically body camera footage that he did not have the opportunity to view until November 7, 2024. (Doc. 28 at 2.)

Defendants persuasively argue, however, that Sparkman's proffered cause is not sufficient because the allegedly new information underlying Sparkman's request was previously known. Sparkman first argues that the camera footage shows that Dawson is the one that provided him with a trashcan to vomit in but that instead of being worried about his medical condition, she only admonished him not to steal its contents after handing it to him. (*See id.*) While the video footage may have reminded Sparkman of the specifics of Dawson's conduct, this information was known by Sparkman both at the time of the incident and at the time he filed his Complaint. Sparkman is not permitted to amend on this basis.

Sparkman also seeks to amend his allegations to include the fact that Dawson spoke to Cole after the incident, showing favoritism for him both physically and verbally. (*See* Doc. 28 at 2.) Once again, however, while Sparkman may not have been previously aware of the specific actions reflected in the video footage, he "filed a PREA investigation [based] on the inappropriate conduct between Dawson and Cole, as it related to the 11-17-2023 assault investigation" on December 17, 2023. (Doc. 25 at ¶ 48; *see also* Doc. 20-7 at 4; Doc. 27 at 3, 6 (indicating that Sparkman raised Dawson's alleged inappropriate

conduct at a December 15, 2023 meeting with Christensen and Bruno).) Because Sparkman was aware of the basis of this claim at the time he filed his original complaint, there is not good cause to permit amendment now.

The closest Sparkman comes to asserting new information is based on the following statement in Dawson's incident summary: "Due to the [mediated] resolution and Inmate Cole having a plea agreement stating that it would be revoked if he got in trouble, *I did not write Inmate Cole up.* This was approved by Sgt. Bruno." (Doc. 20-6 (emphasis added).) Sparkman argues that this is the first time he was made aware that it was Dawson's decision to not discipline Cole. (*See* Doc. 2 at 15 (Sparkman alleging that it was Bruno's decision not to write-up Cole).) However, Sparkman's other filings in the case indicate that, once again, he was aware at the time he filed his original complaint that Dawson was involved in the decision and that, according to his allegations, was inappropriately influenced by her relationship with Cole. (*See* Doc. 27 at 5–6 (Sparkman explaining that his December 2023 PREA report was based on this very ground).)

Accordingly, Sparkman's requests to amend are denied. Nonetheless, the merits of potential claim against Dawson are addressed below to emphasize the additional futility of such amendment.

## II.    Motion Compel

Sparkman has also filed a motion to compel discovery in the case, requesting

the following:

(1) body camera footage of a December 15, 2023 meeting between Sparkman, Bruno, and Christensen;

(2) all "missing bodycam audio and video footage from 7:00 p.m. to 11:00 p.m. on" the day of the assault for Bruno, Dawson, and two other detention officers;

(3) footage and files related to PREA investigation(s);

(4) Bruno's statements at Cole's sentencing hearing; and

(5) missing medical and other "tickets"

(*See* Doc. 27.)  In response, Defendants argue that Sparkman failed to meet and confer, his request is not timely, and that much of the information he seeks to compel does not exist.  Because Defendants' final argument is persuasive, Sparkman's motion is denied.

### A.    Meet and Confer

Defendants first argue that Sparkman failed to confer with opposing counsel before filing the present motion as required by both the Local Rules and the Federal Rules of Civil Procedure.  *See* D. Mont. L.R. 26.3(c)(1); Fed. R. Civ. P. 37(a)(1).  However, Sparkman insists that he spoke with defense counsel twice in person in October 2024 and that he attempted to contact her multiple times over the phone in November 2024, at last informing her office that if he was not able to

speak with her, he would need to file the present motion. (*See* Doc. 36.) Nothing in counsel's affidavit undermines Sparkman's contention that he unsuccessfully attempted to contact her prior to filing the motion. (*See* Doc. 29-1.) Indeed, counsel's affidavit indicates that she was in trial and therefore unavailable during much of the operative time frame. (*See id.*) Thus, Sparkman's motion is not rejected on that ground.

### B.    Timeliness

Defendants further argue that Sparkman's motion is untimely because the "Scheduling Order required all discovery motions to be filed on or before October 30, 2024." (Doc. 29 at 3.) Not so. According to the Scheduling Order, discovery responses were due October 30, 2024, and motions were due November 29, 2024. (*See* Doc. 12 at 6–7.) Indeed, Defendants did not provide written discovery to Sparkman until October 30. (*See* Doc. 29 at 3; Doc. 29-1 at ¶ 9). While not filed until January 2025, Sparkman submitted his motion prior to the motion deadline of November 29, 2024. (*See* Doc. 12 at 7.) It is therefore timely.

### C.    Merits

Finally, Defendants argue that Sparkman's motion should be denied on the merits because the requested information either does not exist or is not relevant to this proceeding. That argument is persuasive. First, Defendants state that the information requested in (1) and (2) above does not exist. While Sparkman

disagrees with that assertion, Rules 11, 26, and 37 of the Federal Rules of Civil Procedure prevent defense counsel from proceeding dishonestly. And while Sparkman argues that the footage should have been preserved in anticipation of litigation, he did not file suit until January 2024 and the case was not served until March 2024. (*See* Docs. 2, 7.) There is no indication that Defendants failed to preserve evidence once they were obligated to do so.

As it relates to (3) and (4) above, both focus on the officers' alleged favoritism for Cole. As discussed in more detail below, the subjective intent of the officers is not relevant to assessing deliberate indifference under the Fourteenth Amendment. *See Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018). Thus, neither the PREA investigation nor Bruno's sentencing comments regarding Cole are relevant to Sparkman's deliberate indifference claims. Finally, Defendants insist that they have disclosed all of Sparkman's "kites" or grievances. Once again, Sparkman's disagreement with that assertion does not undermine its validity. To the extent Sparkman is focused on specific "PureView" medical requests he alleges he made in late November 2023, those facts have been included above and are construed in his favor.

Based on the foregoing, Sparkman's motion to compel—and his related request for sanctions—is denied.

### III.    Summary Judgment

Defendants assert that they are entitled to summary judgment on the grounds that (1) Sparkman failed to administratively exhaust his request for medical care, (2) he fails to prove all the elements of a deliberate indifference claim under the Fourteenth Amendment, and (3) Defendants are entitled to qualified immunity. Because Defendants are correct as to (2), their motion for summary judgment is granted.

### A.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it impacts the outcome of the case in accordance with governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  All reasonable inferences must be viewed in the light most favorable to the nonmoving party. *Tatum v. Moody*, 768 F.3d 806, 814 (9th Cir. 2014). Nonetheless, the nonmoving party must identify, with some reasonable particularity, the evidence that it believes precludes summary judgment. *See Soto v. Sweetman*, 882 F.3d 865, 870 (9th Cir. 2018) (explaining that while pro se parties are exempted from "*strict* compliance with the summary judgment rules,"

they are "not exempt[ed] . . . from *all* compliance," such as the requirement to identify or submit competent evidence in support of their claims).[3]

### B.    Exhaustion

Defendants first argue that summary judgment is warranted because Sparkman failed to exhaust his administrative remedies.  Pursuant to the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under . . . [42 U.S.C. §] 1983 . . . or any other federal law[] by a prisoner . . . until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  This means "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court."  *Woodford v. Ngo*, 548 U.S. 81, 88 (2006).  Exhaustion is mandatory.  *Booth v. Churner*, 532 U.S. 731, 741 (2001); *Jones v. Bock*, 549 U.S. 199, 211 (2007).  Under the PLRA, prison regulations define the exhaustion requirements.  *Jones*, 549 U.S. at 218.

The defendant bears the ultimate burden of proving failure to exhaust.  *See id.* at 216.  If the defendant initially shows that (1) an available administrative remedy existed and (2) the prisoner failed to exhaust that remedy, then the burden of production shifts to the plaintiff to bring forth evidence "showing that there is

---

[3] Defendants' motion was accompanied by the requisite *Rand* Notice, (*see* Doc. 22), and Sparkman responded, (*see* Docs. 24, 25, 31).

something in his particular case that made the existing and generally available

administrative remedies effectively unavailable to him." *Albino v. Baca*, 747 F.3d

1162, 1172 (9th Cir. 2014). Thus, once the defendant has carried his burden, the

prisoner must produce evidence demonstrating that "the local remedies were

ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile."

*Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (internal citations and

quotation marks omitted).

Here, the Grievance Policy at the Lewis and Clark County Detention Center

requires the submission of an initial grievance that is resolved by a detention

officer, followed by several appeals, first to the detention sergeant, then to the

detention lieutenant, and finally, to the detention captain. (Doc. 20-10 at 1.) It

further states that "[a]ll grievances must be submitted within 48 hours of the issue

or complaint being grieved," and that "[a]ny grievance that does not follow the

procedure shall be returned, administratively closed and not considered

exhausted." (*Id.*) Finally, the Grievance Policy provides that "[r]esidents are

required to raise the grievances and complaints as outlined in the established

grievance procedure and exhaust all remedies provided by the procedure before

seeking judicial action." (*Id.*)

Cole assaulted Sparkman on November 17, 2023. It was not until a month

later, on December 14, 2023, that Sparkman filed an electronic grievance reporting

that the incident had been mishandled and requesting medical care related to the incident.  While Sparkman insists that he made prior requests for care, there is no dispute that none of those requests took the form an official grievance submitted through the grievance system.  Sparkman maintains, however, that he met the requirements of the Grievance Policy.  Sparkman emphasizes that the Grievance Policy states that "[t]he first step in the process is to try to find an informal resolution by bringing the issue or complaint to the officer on the floor.  If not resolved, the inmate may file a grievance electronically through the inmate messaging program or, if not able to use the program, through a hand-written grievance form." (Doc. 20-10 at 1.)  According to Sparkman, he made verbal requests for medical care right after the incident when he spoke to Bruno, to a detention officer over the library intercom, and to Dawson when she brought him the trashcan.  He maintains that he also made a verbal request for care to a detention officer the next day, after he discovered blood on his pillow.  He then made another request in the form of submitting a "PureView Packet."  According to Sparkman, it would have been "illogical" for him to further, and formally, grieve the issue when he believed his medical issues were going to be addressed either in response to his verbal requests or in response to his submission of a medical packet.  (Doc. 24 at 10.)  Indeed, as soon as it became clear to Sparkman in early December that he was not going to receive imminent care, he immediately

filed an electronic grievance, titled it an "emergency request," and appealed it through the process.

Based on the foregoing, Defendants fail to show that Sparkman failed to exhaust as required under the Grievance Policy. Construing the facts in favor of Sparkman, as is required as this stage of the proceeding, he made a timely, informal request for care as required by the Policy and followed up with a formal request as soon as it became apparent that care was not forthcoming. Summary judgment is therefore not appropriate on this ground.

## C.    Denial of Medical Care

Section 1983 confers a tort remedy upon individuals "whose constitutional rights have been violated by state officials acting 'under color of' law." *Whalen v. McMullen*, 907 F.3d 1139, 1145 (9th Cir. 2018) (quoting 42 U.S.C. § 1983). Consistently, to prove a claim under § 1983, a plaintiff must show "two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1144 (9th Cir. 2021) (internal quotation marks omitted). Because he is a pretrial detainee, Sparkman's medical care claim derives from the Due Process Clause of the Fourteenth Amendment. *See Gordon*, 888 F.3d at 1124–25; *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021). The elements of such a claim

are:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1125. The third element of objective deliberate indifference requires that a "defendant's conduct must be objectively unreasonable, a test that will necessarily turn on the facts and circumstances of each particular case." *Id.* (cleaned up). Ultimately, "the plaintiff must prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* (quotation marks and footnote omitted).

Here, Sparkman claims Bruno denied him medical care in the immediate aftermath of the assault and that Christensen and Bragg delayed such care once he filed a grievance. (*See* Doc. 2.) Because Sparkman must set forth specific facts as to each individual defendant's alleged deliberate indifference under this standard, *see Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988), the conduct of each Defendant is addressed as relevant below. And for the purposes of considering Sparkman's request to amend, (*see* Doc. 28), Dawson's liability is considered as well. Ultimately, Sparkman fails to show that either Christensen or Bragg made an intentional decision as to his medical care or that Bruno or Dawson were

deliberately indifferent.

### 1.    Intentional Decision

Defendants first argue that Sparkman cannot identify any intentional decisions that were made as it relates to his medical care because he either did not make such a request (Bruno and Dawson) or such care was not improperly delayed (Christensen and Bragg). Only the latter argument is persuasive.

According to Defendants, Sparkman never directly requested medical care from Bruno: "Sgt. Bruno did not make an intentional decision to deny Sparkman medical care when he did not even know he was seeking it." (Doc. 20 at 16.) That argument lacks nuance. To Defendants' point, the video evidence shows that, contrary to his allegations, Sparkman did not directly request medical care from Bruno. Sparkman insists that he told Bruno he was dizzy and needed medical care and that, in response, Bruno told him that "it was just adrenaline." (*See, e.g.*, Doc. 2 at 12, 28, 32.) However, the recording of that conversation shows that while Sparkman did tell Bruno he was dizzy and anxious and Bruno did refer to adrenaline, (*see* Doc. 20-1 at 2:46–2:50), Sparkman did not explicitly request medical care, (*see generally id.*). Nevertheless, in a failure-to-act case "where a defendant actually knew of a substantial risk of serious harm and consciously took no action, one would expect a jury to find that the defendant made an intentional decision." *Castro v. City of L.A.*, 833 F.3d 1060, 1071 n.4 (9th Cir. 2016). Thus,

whether Bruno's conduct was intentional turns on the third element of the *Gordon* test, i.e., whether he was objectively indifferent to a serious medical need, which is addressed below.

The analysis for Dawson is much the same. The video recordings in the case show that Sparkman did not explicitly ask her for medical care at the time and in the manner he alleges. (*See* Doc. 20-11 at 13:50–15:07.) To the contrary, he tells her that his nausea might be "just the stress of it all." (*Id.* at 14:13.) However, it is undisputed that Dawson knew Sparkman had been slapped on the head and that he was dizzy and nauseous. She even provided him with a trashcan to vomit in. Thus, whether her conduct was intentional turns on whether she was objectively indifferent to a serious medical need, which is addressed below.

On the other hand, Defendants persuasively argue that the record shows neither Christensen nor Bragg made an intentional decision to delay Sparkman's care. Both officers did determine that Sparkman's December 12 grievance lacked merit because it was untimely and, in their opinion, the assault incident had been properly handled. However, neither decision impeded nor intended to impede Sparkman's pending request for medical care. Indeed, Bragg's December 21 denial specifically stated that, in light of Sparkman's grievance, "[m]edical has reached out . . . and will be getting you seen for your concerns." (Doc. 20-7 at 2.) Sparkman was seen by a nurse that same day, who confirmed he had an existing

appointment to see a doctor in February 2024. (*See id.* at 13.) Sparkman's delayed care claims against Christensen and Bragg therefore fail on this ground.

### 2.    Objective Indifference

"The mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Gordon*, 888 F.3d at 1125 (quotation marks omitted). "The reckless disregard standard is a formidable one. Neither mere lack of due care, nor an inadvertent failure to provide adequate medical care, nor even medical malpractice, without more, is sufficient to meet this standard." *Fraihat v. U.S. Imm. & Customs Enf.*, 15 F.4th 613, 636 (9th Cir. 2021) (cleaned up). "Instead, a plaintiff must show that the defendant disregarded an excessive risk to the plaintiff's health and safety by failing to take reasonable and available measures that could have eliminated that risk." *Id.* (internal quotation marks and alteration omitted). Under the "objective indifference" element, "[a] defendant can be liable even if he did not actually draw the inference that the plaintiff was at a substantial risk of suffering serious harm, so long as a reasonable official in his circumstances would have drawn that inference." *Russell v. Lumitap*, 31 F.4th 729, 739 (9th Cir. 2022).

As a preliminary matter, Sparkman makes much of Bruno and Dawson's purported bias in favor of Cole. (*See, e.g.*, Doc. 2 at 16, 33; *see also* Doc. 27.) The subjective intent of the officers is irrelevant, however, in assessing deliberate

indifference under the Fourteenth Amendment, which applies an objective test. *See Russell*, 31 F.4th at 739. The dispositive question is whether an objective officer in this situation would have found a substantial risk of serious harm and acted accordingly given that risk. *See Gordon*, 888 F.3d at 1125. Thus, Bruno and Dawson's alleged favoritism does not bear on Sparkman's medical claim.

As indicated above, Sparkman alleges that he specifically requested medical care immediately following the incident. However, the video footage shows that while he informed Bruno and Dawson that he was dizzy and nauseous, he never explicitly told either one that he affirmatively wanted or needed medical care. To the contrary, the footage shows that Sparkman was alert and focused primarily on how the incident was going to affect his housing situation, not his purported medical condition. Sparkman asked to speak with Bruno directly and Bruno sat down with him to discuss the incident. While Sparkman alleges that he was pressured into not pursuing charges against Cole, his recorded conversation with Bruno shows that not only did Bruno ask him multiple times how he wanted to proceed, but he also specifically stated that it was Sparkman's choice. In response, Sparkman, not Bruno, proposed pursuing an informal resolution that allowed him to return to Pod 7. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonably jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion

for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Given the undisputed facts surrounding the incident as evidenced in the video footage submitted by Defendants, Sparkman fails to show that either Bruno or Dawson disregarded an objectively excessive risk to his health and safety by failing to request medical care on his behalf.

### 4.    Conclusion

Because Sparkman's deliberate indifference claims fail on the above grounds, the Court need not—and does not—address the issues of serious medical need, causation, or qualified immunity.

### CONCLUSION

Based on the foregoing, IT IS ORDERED that:

1.    Sparkman's motions to amend (Docs. 17, 28) are DENIED.

2.    Sparkman's motion to compel (Doc. 27) is DENIED.

3.    Defendants' motion for summary judgment (Doc. 19) is GRANTED.

4.    The Clerk is directed to enter judgment in favor of Defendants and close the case file.

DATED this **27**ᵗʰ day of March, 2025.


Donald W. Molloy, District Judge
United States District Court